PREGERSON, Circuit Judge,
dissenting:
I part ways with the majority when it comes to the issue of ineffective assistance of counsel at the penalty phase. The majority opinion concludes that Cox’s attorneys did not provide ineffective assistance *902 during the penalty phase even though they failed to investigate critical, readily available records that would have revealed the full extent of Cox’s abusive childhood. The majority reasons that this evidence would have been cumulative and also would have been inconsistent with trial counsel’s non-shooter theory. In the alternative, the majority opinion concludes that any deficiency by Cox’s attorneys during the penalty phase did not prejudice Cox because the omitted mitigation evidence was cumulative and the aggravating evidence was substantial. Because neither the record nor the law supports these conclusions, I dissent.
To prevail on his ineffective assistance claim, Cox must show: (1) “that counsel’s performance was deficient” and (2) “that the deficient performance prejudiced the defense.” Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Here, Cox’s attorneys performed deficiently because they failed to conduct a reasonable investigation of Cox’s abusive childhood. Cox’s attorneys were on notice of Cox’s juvenile dependency records and his abusive mother’s arrest records and court files, but failed to obtain and review them. These records would have demonstrated that Cox suffered severe abuse until he was eleven years old and that he routinely was exposed to violence. Cox’s attorneys’s failure to obtain and present this evidence prejudiced Cox. Had the jury known the full extent of Cox’s abusive childhood, it is reasonable to conclude that at least one juror would have voted that Cox suffer a life sentence rather than a sentence of death.
I. Cox’s Attorneys Provided Deficient Performance During the Penalty Phase of Cox’s Trial
Deficient performance exists when counsel’s representation “[falls] below an objective standard of reasonableness.” Id. at 688, 104 S.Ct. 2052. Because “[i]t is imperative that all relevant mitigating information be unearthed for consideration at the capital sentencing phase,” Caro v. Calderon, 165 F.3d 1223 (9th Cir.1999), counsel performs deficiently if it does not conduct a reasonable investigation of the defendant’s background. This inquiry should include investigation of the defendant’s history of family abuse, Summerlin v. Schriro, 427 F.3d 623, 630 (9th Cir. 2005) (en banc); a thorough examination of all readily available records, Williams v. Taylor, 529 U.S. 362, 395-96, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); and the active pursuit of all relevant mitigation leads, Lambright v. Schriro, 490 F.3d 1103, 1117 (9th Cir.2007).
A. Cox’s Attorneys Failed to Obtain All Reasonably Available Mitigating Evidence
I agree with the majority opinion insofar as “[t]his is not a case in which defense counsel simply ignored their obligation to find mitigating evidence....” Rompilla v. Beard, 545 U.S. 374, 381, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005). I disagree, however, that conducting some mitigation investigation is tantamount to conducting a reasonable investigation. Both this court and the Supreme Court have found deficient performance when counsel conducted some investigation into mitigating evidence, but failed to discover all reasonably available mitigating evidence. See, e.g., Rompilla, 545 U.S. at 381-83, 125 S.Ct. 2456 (finding deficient performance because defense counsel failed to examine a court file on Rompilla’s prior conviction, even though counsel interviewed Rompilla and several members of his family, and examined reports by three mental health experts); Douglas v. Woodford, 316 F.3d 1079, 1087 (9th Cir.2003) (finding deficient performance even though counsel’s penalty-phase investigation included interviews of Douglas’s “wife, son, friends, and neighbors”).
*903 Here, Cox’s attorneys knew or should have known about the existence of Cox’s juvenile dependency records and his mother’s arrest records and court files, yet failed to obtain them. These readily available records would have demonstrated that Cox, eighteen years old at the time of the murders, had spent a substantial part of his formative years under the primary care of his mother, Sondra Holt, an alcoholic and a prostitute.[1] While under the care of his mother, Cox experienced severe abuse and was routinely exposed to violence:
• On June 3, 1970, when Cox was only four years old, Cox watched his mother try to kill his sister, Edrina Meyers.
• In August 1970, Everette Myers, the boyfriend and pimp of Cox’s mother, was shot and killed outside the mother’s door while Cox, four years old at the time, was inside the house.
• On December 15, 1970, when Cox was five years old, Cox witnessed his mother attacking a police officer with a knife.
• On January 23, 1971, when Cox was five years old, Cox witnessed his mother being taken away by ambulance after she was stabbed by a boyfriend.
• In 1973 or 1974, when Cox was eight or nine years old, Cox’s mother set fire to the front door of the house of Cox’s grandmother, where Cox was staying.
• In July 1977, when Cox was eleven years old, Cox’s mother was arrested in front of Cox for assault with a deadly weapon.
• In August 1977, when Cox was eleven years old, Cox’s mother pushed Cox up against the wall, struck him in the face several times, and gave him a black eye.
• In September 1977, when Cox was eleven years old, Cox’s mother threatened him with a steak knife.
• On numerous occasions, Cox’s mother became intoxicated to the extent that she could not provide care or supervision for Cox.
All of this evidence of abuse could have been discovered in Cox’s dependency court file and in his mother’s arrest records and court files.[2] The State stipulated that Cox’s attorneys were on notice that these documents were available and could have been easily obtained. The State also stipulated that Cox’s attorneys “knew or should have known that Mr. Cox and his siblings were removed from his mother’s care as the result of court intervention” and that Cox’s attorneys were “aware that Cox’s mother had been in and out of prison during the time she raised Cox.” Moreover, the State stipulated that Cox’s attorneys had obtained Cox’s school records. These records stated that Cox was placed in foster care at the age of twelve, indicating that Cox may have spent substantially *904 more time under his abusive mother’s care than other evidence suggested.
The majority opinion relies on the Supreme Court’s recent decision in Bobby v. Van Hook, — U.S. -, 130 S.Ct. 13, 175 L.Ed.2d 255 (2009) (per curiam) to conclude that Cox’s attorneys performed a reasonable investigation because the unexplored documents would have only produced cumulative evidence.[3] Maj. Op. 896-97. Van Hook is inapposite. In Van Hook, the Supreme Court held that trial counsel did not perform deficiently by failing to interview certain family members because trial counsel already uncovered extensive evidence of Van Hook’s traumatic childhood. Van Hook, 130 S.Ct. at 19. The Court noted, “[t]his is not a case in which defendant’s attorneys failed to act while potentially powerful mitigating evidence stared them in the face, or would have been apparent from documents any reasonable attorney would have obtained.” Id. (internal citations omitted).
Unlike trial counsel in Van Hook, Cox’s trial counsel “failed to act while potentially powerful mitigating evidence ... would have been apparent from documents any reasonable attorney would have obtained.” Id. Cox’s trial counsel knew that Cox’s mother had beaten and lost custody of her children more than once. Maj. Op. 895. Yet they failed to obtain and review the documents that would be most relevant to demonstrating the severity of this abuse. It is hard to imagine documents more relevant to demonstrating the severity of Cox’s childhood abuse than Cox’s juvenile dependency records or Cox’s mother’s arrest records and court files. Cox’s attorneys knew these records existed and could have easily obtained them. Any reasonable attorney would have obtained these documents and Cox’s attorneys’s failure to do so constitutes deficient performance. See Lambright v. Schriro, 490 F.3d 1103, 1117 (9th Cir.2007) (“[W]hen ... indications in the record suggest that certain mitigating evidence may be available, those leads must be pursued.”) (internal quotation marks omitted).
B. Cox’s Attorneys’s Failure to Obtain Cox’s Juvenile Dependency Records and Other Evidence of Childhood Abuse Was Not a Strategic Decision
The majority opinion also contends that Cox’s attorneys’ failure to investigate Cox’s traumatic childhood further was a “strategic choice” because the evidence would have been “at odds” with trial counsel’s primary non-shooter theory.[4] Maj. Op. 898-99. The majority opinion speculates that presenting evidence of Cox’s abusive childhood “would only have raised inferences that [Cox’s] abusive childhood turned him into a hardened criminal who was quite capable of murdering four people” and “made it seem more likely that he *905 was the shooter.” Maj. Op. at 897. The majority opinion, however, offers no support for such a conclusion.
To the contrary, the evidence of childhood abuse could have easily raised inferences that evoked sympathy for the eighteen-year-old Cox. Such evidence could have explained why Cox ended up in a gang and how Cox ended up in a position where he was aiding Williams in the perpetration of the murders. Indeed, one of Cox’s attorneys acknowledged that the omitted childhood abuse' evidence “would have been helpful to [the] defense” and “consistent with the themes that [they] presented in mitigation.” Where, as here, “counsel offers no strategic reason for failing to perform what would otherwise constitute the duty of a reasonably competent counsel, we may not invent such a strategy by engaging in a ‘post hoc rationalization of counsel’s conduct’.” See Richter v. Hickman, 578 F.3d 944, 959 (9th Cir.2009) (holding that counsel’s failure to consult blood experts was not a strategic choice because counsel offered no reasoned explanation for the failure).
Moreover, the Supreme Court has acknowledged that childhood abuse evidence is not at odds with a theory that the defendant was not directly responsible for the crime, and that its discovery may actually change counsel’s strategy. See Wiggins v. Smith, 539 U.S. 510, 535, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003). Accordingly, Cox’s attorneys’s failure to obtain and present evidence of the severe abuse suffered by Cox at the hands of his mother was not a strategic decision, but a clear failure by defense counsel to conduct a reasonable investigation.[5]
II. Absent the Deficient Performance of Cox’s Attorneys, a Reasonable Probability Exists That at Least One Juror Would Have Voted to Impose a Life Sentence Rather than a Death Sentence
Prejudice is established where, “there is a reasonable probability that, absent the *906 errors, the sentencer ... would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.” Strickland, 466 U.S. at 695, 104 S. Ct. 2052. “A reasonable probability is one ‘sufficient to undermine confidence in the outcome,’ but is ‘less than the preponderance more-likely-than-not standard.’ ” Lambright, 490 F.3d at 1121 (quoting Summerlin, 427 F.3d at 640, 643). Because California requires that a unanimous jury impose a death sentence, the question here is whether “there is a reasonable probability that at least one juror would have struck a different balance [between life and death].” Wiggins, 539 U.S. at 537, 123 S.Ct. 2527.
Relying on the Supreme Court’s recent decisions in Wong v. Belmontes, — U.S. -, 130 S.Ct. 383, 175 L.Ed.2d 328 (2009) and Bobby v. Van Hook, — U.S. -, 130 S.Ct. 13, 175 L.Ed.2d 255 (2009), the majority opinion concludes that Cox was not prejudiced by his counsel’s failure to obtain and present evidence of Cox’s severe childhood abuse because the omitted mitigating evidence would have been cumulative and contradictory to the defense counsel’s theories, and because the aggravating evidence was so great. Maj. Op. 900, 900-01. This conclusion is legally and factually unsupportable.
A. The Omitted Mitigation Evidence Was Not Cumulative of the Evidence Presented at Trial
The majority opinion erroneously concluded that the omitted mitigation evidence would be cumulative of the evidence presented at trial. In both Belmontes and Van Hook, the Supreme Court determined that the defendant was not prejudiced because omitted mitigating evidence would have been cumulative of what had been presented to the trial court. In Belmontes, the Supreme Court concluded that additional humanizing evidence, such as the fact that his family lived in “constant strife,” that his sister died of a brain tumor, and that he was respectful to his grandparents, would have been cumulative of the evidence actually presented at trial, which highlighted Belmontes’ “terrible” childhood and strong relationships with his family. Belmontes, 130 S.Ct. at 386, 387-88. Similarly, in Van Hook, the Supreme Court concluded that “the minor additional details” of Van Hook’s traumatic childhood, which the interviews with additional family members would have revealed, did not prejudice Van Hook because counsel had already presented extensive evidence of Van Hook’s traumatic childhood at trial.[6] Van Hook, 130 S.Ct. at 19-20.
Here, the omitted mitigation evidence would not have been cumulative of the evidence presented at trial. At trial, Cox’s attorneys only presented cursory details of Cox’s abusive childhood and left the incorrect impression that Cox came from a loving and stable home and was raised primarily by his great-grandmother.[7] The omitted mitigating evidence would have shown that Cox spent many of his formative years with his abusive and neglectful *907 mother, and was subject to a litany of traumatic events while under her care.
Specifically, the omitted mitigation evidence would have demonstrated that Cox, eighteen years old at the time of the murders, experienced his mother’s violent behavior from the age of four to eleven. That behavior included threatening Cox with a steak knife, attempting to kill Cox’s sister, and setting the residence at which Cox was staying on fire. Cox also observed a great deal of violence, which included witnessing his mother attack a police officer with a knife, watching his mother be taken away in an ambulance after her boyfriend stabbed her, and being on the scene when his mother’s boyfriend was shot and killed. Accordingly, unlike in Belmontes or Van Hook, the omitted mitigation evidence in this case was not cumulative of the evidence presented at trial.
B. The Omitted Mitigation Evidence Would Not Have Contradicted Counsel’s Defense Theories
Relying on Belmontes, the majority opinion also erroneously concludes that the omitted mitigation evidence would have undermined counsel’s primary non-shooter theory. Maj. Op. 899. This case is clearly distinguishable from Belmontes. In Belmontes, the omitted mitigation evidence regarding Belmontes’ mental state would have “opened the door” for the prosecution to introduce the “strongest possible evidence in rebuttal — the evidence that Belmontes was responsible for not one but two murders.” 130 S.Ct. at 389.
Here, the introduction of evidence about Cox’s abusive childhood would not have had any negative ramifications. As discussed above, the majority opinion’s notion that childhood abuse evidence would contradict counsel’s non-shooter argument is unfounded. The Supreme Court has noted that childhood abuse evidence is not at odds with a theory that the defendant is not directly responsible for the crime, see Wiggins, 539 U.S. at 535, 123 S.Ct. 2527, and in this case, such evidence could have explained why Cox ended up in a gang and how he ended up in a position where he was aiding Williams in the perpetration of the murders. Accordingly, unlike in Belmontes, the omitted mitigation evidence would not have undermined counsel’s trial strategies.
C. The Aggravating Evidence Presented During the Penalty Phase Does Not Preclude a Finding of Prejudice
Relying on Van Hook, the majority opinion also concludes that omission of Cox’s severe childhood abuse was not prejudicial because of the weight of the aggravating factors. Maj. Op. 900. Specifically, the majority opinion points out the violent nature of the murders and that Cox participated in the murders for money. As a preliminary matter, the prosecution did not present overwhelming evidence that Cox was the shooter or that the murders were for hire.
The two surviving witnesses, who were actually inside the house when the shootings occurred, gave a description of the shooter that matched co-defendant C.W. Williams (“Williams”) rather than Cox. The witnesses described the intruder carrying the rifle as twenty-five to thirty-five years old, 5'10" to 5'H" and well-built with a dark complexion, short hair, and dark clothing. On the day of the murders, co-defendant Williams was in his mid-twenties, had a dark complexion, short hair and a muscular build, and wore a dark blue shirt and dark pants. Cox, on the other hand, was only eighteen years old, had a light complexion, a medium build and braided hair, and wore tan pants on the day of the murders.
*908 Moreover, two of the prosecution’s key witnesses, Ida Moore (“Moore”) and Lisa Brown (“Brown”), were impeached during trial. These witnesses testified that Cox stated after the murders, “I just blew the bitch’s head off.” Moore was impeached by her inconsistent testimony at co-defendant Horace Burns’s (“Burns”) trial, during which she attributed the “I just blew the bitch’s head off’ statement to Williams, not Cox.[8] Brown was impeached by her statement to the police that she wasn’t sure if Williams or Cox stated “I just blew the bitch’s head off.”
The prosecution presented evidence that Cox purchased a $3,000 Cadillac after the murders, but this evidence does not establish that Cox participated in the murders for money. Regardless of whether Cox was the shooter or committed the murders for money, the aggravating evidence does not preclude a finding of prejudice. There is no question that this case involves a horrible and senseless crime. Nevertheless, we have repeatedly found prejudice in capital cases that presented aggravating evidence which were equally, if not more, troubling than the facts here.
In Hovey v. Ayers, 458 F.3d 892 (9th Cir.2006), this court found prejudice even though Hovey was sentenced to death for the brutal kidnaping and murder of an eight year-old girl. Hovey bound the girl’s wrists and thighs, fractured her skull in six places, and stabbed her fourteen times. Id. at 898. The jury also learned during the penalty phase that Hovey had previously been convicted of kidnaping another young girl. People v. Hovey, 44 Cal.3d 543, 244 Cal.Rptr. 121, 749 P.2d 776, 795-96 (1988). Nevertheless, this court found that Hovey’s death sentence was prejudiced by his counsel’s deficient performance. Hovey, 458 F.3d at 930-31. We explained that, even though Hovey’s counsel called eighteen witnesses during the penalty-phase, Hovey’s death sentence was prejudiced by his attorney’s failure to provide all of the pertinent records to an expert witness. Id. at 924-25, 930-31.
In Douglas v. Woodford, 316 F.3d 1079 (9th Cir.2003), this court found prejudice even though Douglas was sentenced to death for murdering two teenage girls. Douglas forced the two girls to have sex with each other at gunpoint and then forced the girls to orally copulate him. People v. Douglas, 50 Cal.3d 468, 268 Cal.Rptr. 126, 788 P.2d 640, 647 (1990), overruled on other grounds by People v. Marshall, 50 Cal.3d 907, 269 Cal.Rptr. 269, 790 P.2d 676 (1990). Douglas then choked, cut, and murdered the girls. Id. In addition to the horrific details of this crime, the jury also learned of Douglas’s violent past. Two women testified that Douglas forced them to pose for nude pictures and perform sexual acts on him. Douglas, 316 F.3d at 1084. The jury also heard testimony that Douglas planned to torture and kill young women to make sex films. Id.
Despite the horrific nature of the killings and the significant aggravating evidence presented by the prosecution, we found that counsel’s deficient performance prejudiced Douglas during the penalty phase because Douglas’s attorney failed to uncover and present extensive evidence of childhood abuse. Id. at 1089-91. Although the jury heard several of Douglas’s family members testify, and learned that Douglas had been orphaned as a child and grew up poor, we explained that Douglas was prejudiced because the jury never learned the full extent of his troubled past. Id. at 1087-88,1090.
The aggravating evidence in Cox’s case was substantially weaker than in Douglas *909 or Hovey.[9] Cox’s prior criminal history included two juvenile robberies, which are less serious crimes than Douglas’s depraved sexual acts or Hovey’s prior kidnaping of a young girl. Moreover, the murders in Cox’s case were less gruesome than the murders in Douglas, which involved sadistic torture, or in Hovey, which involved the kidnaping and murder of an eight year old girl.
Had Cox’s attorneys conducted a reasonable investigation of Cox’s childhood and presented evidence of the severe abuse and trauma that Cox experienced as a child, there is a reasonable probability that at least one juror would have felt sympathy for Cox and voted differently. See Wiggins, 539 U.S. at 537, 123 S.Ct. 2527. Accordingly, “consider[ing] all the relevant evidence that the jury would have had before it if [Cox’s attorneys] had pursued a different path,” Belmontes, 130 S.Ct. at 386, Cox’s attorneys’ failure to obtain and present evidence of Cox’s extensive childhood abuse was prejudicial.
D. The Length of the Jury’s Deliberations During the Death Penalty Phase Supports a Finding of Prejudice
I also believe that the length of the jury’s deliberations during the penalty phase of Cox’s trial strongly supports a finding of prejudice. See e.g. Daniels v. Woodford, 428 F.3d 1181, 1209 (9th Cir. 2005) (finding prejudice, in part, because “[t]he jury deliberated for two days before returning a verdict of death”). Here, the jury deliberated for three days during the penalty phase of Cox’s trial and asked to see key pieces of evidence regarding the identity of the shooter. The length of the jury deliberations and the jury’s request for additional evidence indicates that the jury’s decision to impose a sentence of death was not an easy one and that any additional mitigating evidence may have changed the outcome.
Accordingly, I believe that a reasonable probability exists that the additional mitigating evidence of childhood abuse would have led at least one juror to vote for a sentence of life in prison rather than a sentence of death.
III. Conclusion
At the time of the murders, Cox was eighteen years old. Although the jury was left with the incorrect impression that Cox had experienced a fairly normal childhood, the record demonstrates that Cox suffered severe abuse at the hands of his mother and was routinely exposed to extreme vio *910 lence. I believe that Cox’s attorneys provided ineffective assistance by failing to obtain and present evidence of Cox’s severe childhood abuse, which was readily available in Cox’s dependency court file and in Cox’s mother’s arrest records and court files. Had this evidence been presented to the jury, a reasonable probability exists that this evidence would have evoked sympathy for Cox and led at least one juror to vote for a sentence of life in prison rather than death.[10]
Accordingly, I dissent.

. The juvenile dependency records reveal that Cox’s mother, Sondra Holt (“Holt”), retained custody of Cox from when he was born on December 1, 1965, until he was declared a dependent child of the court on December 8, 1977. Holt was Cox’s primary caretaker until 1971, although he also lived intermittently with his great-grandmother during this time. Moreover, Cox lived with Holt for eight or nine months in 1977.

. Had Cox's attorneys interviewed additional family members, they would have also discovered: (1) when Cox was slightly less than four years old, his mother tried to kill Cox and his siblings; and (2) when Cox was nine years old, he and his siblings witnessed their mother attempt suicide. I see no need to reach whether Cox’s attorneys’s failure to interview these family members constituted deficient performance because Cox’s attorneys’s failure to obtain and present the evidence in Cox’s dependency court file and in his mother’s arrest records and court files clearly constituted deficient performance.

. The majority also cites to Bible v. Ryan, 571 F.3d 860, 872 (9th Cir.2009) to support its argument that Cox’s counsel did not perform deficiently because any additional investigation would have been cumulative. Bible did not even reach the deficiency prong of the ineffective assistance of counsel analysis. See id. at 872 ("We hold that the absence of evidence that was cumulative of what had already been presented ... does not undermine our confidence in the outcome of Bible's sentencing hearing. ... {W}e cannot properly say that the Arizona court’s decision that Bible suffered no prejudice was an unreasonable application of Strickland.") (emphasis added). Accordingly, reliance on this case is unfounded.

. There is also evidence that Cox’s attorneys provided ineffective assistance with respect to the non-shooter theory. Cox’s attorneys made no attempt to interview Stanley Cheathem ("Cheathem”), who was present at Ida Moore's house, the location where all the co-defendants congregated before the murders. Cox’s attorneys even made notes to interview Cheathem, but never followed through.
*905 Had Cox’s attorneys interviewed Cheathem, they would have discovered the following:
• Williams had a "violent temperament,” was paranoid, and was "scary to be with,” and became "increasingly paranoid and unpredictable” when he was on crack.
• In the weeks leading up to the murders, Williams was constantly hustling for crack, hustling for money for crack, and smoking crack.
• Cheathem did not take Williams seriously in the days leading up to the murders because "[Williams] was so cracked out and pumped up.”
• The night before the murders Williams smoked crack.
The above testimony would have bolstered Cox’s theory that Williams was the actual shooter by demonstrating that Williams was likely under the influence of crack cocaine when the murders occurred and that Williams had a strong propensity for violence, particularly while under the influence of crack cocaine. Because Cox’s attorneys clearly rendered ineffective assistance of counsel by failing to obtain and present evidence of the severe childhood abuse suffered by Cox, I see no need to reach the question whether Cox’s attorneys also provided ineffective assistance by failing to interview Stanley Cheathem.

. The majority opinion also notes that Cox refused to cooperate and threatened to "cause a disturbance” in court if negative information about his mother was presented. Maj. Op. 895. Cox’s failure to cooperate with his attorneys did not eliminate his attorneys’s duty to investigate, and thus did not excuse his attorneys's deficient performance. See, e.g., Douglas, 316 F.3d at 1089-90 Moreover, the record clearly indicates that Cox's attorneys did not even heed his instructions, and in fact presented negative information about his mother to the court. Accordingly, Cox’s attorneys’s deficient investigation of Cox’s severe childhood abuse cannot be excused by Cox’s uncooperativeness or his instructions not to present negative information about his mother. See Douglas, 316 F.3d at 1089.

. At trial, Van Hook's counsel presented evidence that Van Hook started drinking as a toddler, began "barhopping” with his father at age nine, drank and used drugs regularly with his father from age eleven forward, frequently observed his father hold his mother at gun- and knife-point, watched episodes of sexual violence, and was beaten on at least one occasion. Id. at 18.

. Cox’s great-grandmother erroneously testified that she raised Cox from infancy to age fourteen. The juvenile dependency records would have revealed that Cox’s mother was his primary caretaker from his birth to age six or seven.

. At Burns's trial, Moore testified that the person who closed the van door stated "I just blew the bitch’s head off.” She further testified that Williams, not Cox, was the person who closed the van door.

. The majority opinion contends that Hovey and Douglas are distinguishable. Maj. Op. 900. The majority opinion notes that Hovey involved defense counsel’s failure to provide medical records to the psychiatrist, who was a key witness. Maj. Op. 900. This is a correct interpretation of the case, but does not address my reason for citing the case — that prejudice was found notwithstanding substantial aggravating evidence.
The majority opinion provides more relevant and precise reasoning for its contention that Douglas is inapposite. The majority opinion notes that in Douglas, counsel had totally failed to present any evidence of Douglas’s "serious and outstanding mental illness," and that Cox cannot point to a “total absence of evidence” regarding any particular area of his life. Maj. Op. 900. I do not think that Douglas stands for the proposition that a “total absence of evidence” regarding a particular area is prejudicial while inadequate presentation of evidence in a particular area is not. In fact, such a reading of Douglas would be contrary to the well-settled notion that prejudice is determined by balancing aggravating and mitigating circumstances. See Strickland, 466 U.S. at 695, 104 S.Ct. 2052. Accordingly, I believe that Hovey and Douglas support my view that Cox was prejudiced by the omission of his extensive childhood abuse, notwithstanding strong aggravating evidence.

. In the face of counsel's clear ineffective assistance at the penalty phase of Cox's trial, I see no need to reach the shackling issue.